IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNELL L. NIXON,<br><br>        Plaintiff,<br><br>v.<br><br>DELAWARE TITLE LOANS, INC., et al.,<br><br>        Defendants. | CIVIL ACTION<br>NO. 12-7005 |

<u>**OPINION**</u>

**Slomsky, J.**                                                                                                               **May 23, 2013**

## I.     INTRODUCTION

Between December 1, 2009 and May 20, 2011, Plaintiff Donnell L. Nixon received five loans from Defendant Delaware Title Loans, Inc. ("DTL").  DTL secured each loan in two ways. DTL would place a lien on Plaintiff's vehicle, a 2000 Chevrolet Tahoe, and also take title to the Tahoe as collateral.  In late 2011, Plaintiff defaulted on the fifth loan.  After the default, he sent three letters to DTL disputing DTL's right to maintain a lien on his vehicle and expressing his desire to arbitrate DTL's right to collect on the defaulted loan.  DTL did not respond to the letters.

On December 14, 2012, Plaintiff initiated this lawsuit by filing a Complaint against three Defendants:  DTL, Community Loans of America, Inc. ("CLA"), and Robert Reich.  Plaintiff contends that CLA is the parent company of DTL, and that Reich is the owner and president of DTL and CLA.  In the Complaint, Plaintiff asserts two claims: (1) a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); and (2) usury in violation of Pennsylvania law, 41 Pa. Cons. Stat. §§ 201, 408, 501–04.

On March 1, 2013, after waiving service of the Complaint, Defendants filed a Motion to Compel Arbitration and Stay Proceedings (Doc. No. 3), which is presently before the Court. Defendants seek to compel Plaintiff to arbitrate his claims in accordance with an arbitration clause in the agreements controlling Plaintiff's loan. Plaintiff does not dispute that arbitration is warranted as to CLA or Reich, and the Motion will be granted as to those two Defendants as unopposed.[1] For reasons that follow, the Court will also grant the Motion as to DTL.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Loans

DTL is a Delaware corporation that makes secured loans to consumer borrowers. (Doc. No. 1 at 1–2.) Interest rates on the loans are often in excess of 300%.[2] (Id. at 2.) DTL holds as collateral title to the borrower's automobile. (Id.) For borrowers residing in Pennsylvania, DTL also records a lien on the vehicle with the Pennsylvania Department of Transportation. (Id.) When a Pennsylvania borrower defaults on his loan, DTL retains the right to foreclose on the collateral through self-help repossession of the borrower's car. (Id. at 3.)

---

[1] As discussed infra, Plaintiff argues here that the arbitration clause is unenforceable because DTL breached the arbitration provision. He contends that he sent three letters to DTL attempting to initiate arbitration before filing this lawsuit, each of which DTL ignored, and that DTL's refusal to participate in arbitration constitutes a breach of the arbitration clause. During the April 3, 2013 hearing held on this Motion, counsel for Defendants noted that Plaintiff's argument only applies to DTL because he did not send letters to CLA or Reich. In effect, Defendant's position is that the Motion is unopposed as to those two Defendants. Defendants reiterated this position in their post-hearing Supplemental Memorandum of Law (Doc. No. 14 at 1–2 n.2). Plaintiff did not address this argument in his Supplemental Memorandum of Law, nor did he mention CLA or Reich at all. (Doc. No. 15.) Consequently, the Court will consider Defendants' Motion to be unopposed as to Defendants CLA and Reich.

[2] Although these interest rates are excessive, the rates are permissible under Delaware law because Delaware does not have a usury statute. See Kaneff v. Del. Title Loans, Inc., 587 F.3d 616, 622 (3d Cir. 2009). Though the rates may be usurious under Pennsylvania law, as discussed infra, a district court analyzing the validity of an arbitration agreement does not consider the merits of the claims giving rise to the controversy. Gay v. CreditInform, 511 F.3d 369, 386 (3d Cir. 2007).

Between December 1, 2009 and May 20, 2011, Plaintiff, a Pennsylvania resident, received five loans from DTL. (Id. at 16, 20, 25, 30, 36.) The first loan was made on December 1, 2009 for $1,050 at a 299.28% Annual Percentage Rate ("APR"). (Id. at 5, 16.) The second loan was made on January 28, 2010 for $1,600 at a 357.06% APR. (Id. at 5, 20.) The third loan was made on March 19, 2010 for $1,552.03 at a 362.26% APR. (Id. at 5, 25.) On this loan Plaintiff received $1,000 and refinanced $552.03 of prior debt. (Id.) The fourth loan was made on October 21, 2010 for $1,409.56 at a 360.32% APR. (Id. at 6, 30.) This loan was used to refinance the remaining debt on the third loan. (Id.) The fifth loan was made on May 20, 2011 for $605 at a 362.6% APR. (Id. at 6, 36.) Plaintiff made payments of $745 on this loan. (Id. at 6.) These payments were applied to interest. (Id.) At the end of 2011, Plaintiff defaulted on the loan.[3]

For each of the five loans, Plaintiff signed a "Loan Agreement, Promissory Note and Security Agreement" ("Loan Agreement"). (Id. at 16–38.) Each contract provides as follows:

> To secure the BORROWER'S obligations under this Agreement, BORROWER hereby grants to LENDER a security interest in the Motor Vehicle described above ("Vehicle"), all accessories and accessions to the Vehicle, and all proceeds related thereto, including all insurance proceeds or refunds of insurance premiums related to the Vehicle (all such property referred to as "Collateral"). BORROWER agrees to provide a valid unencumbered certificate title to the Vehicle and to pay any amounts paid by LENDER to the Department of Motor Vehicles associated with the recording of LENDER'S security interest, as itemized above, and that such amounts are non-refundable. BORROWER further agrees to reimburse LENDER upon its request for any costs incurred by LENDER in enforcing its rights against the Collateral.

(Id. at 16, 20, 25, 30, 36.) To comply with this term in each contract, Plaintiff provided DTL information about the year, make, model, Vehicle Identification Number ("VIN"), and license

---

[3] Although it is not clear from the Complaint or the parties' memoranda of law, it appears that only the fifth loan is in default.

3

plate number of his vehicle, a 2000 Chevrolet Tahoe.  DTL used this information to record a lien on the vehicle.  (Id. at 16, 20, 25, 30, 36.)

Each Loan Agreement also contains a provision entitled "Lender's Rights in the Event of Default," which provides:

> LENDER may, at its option, and without notice or demand, do any one or more of the following: (a) declare the whole outstanding balance due under this Agreement due and payable at once and proceed to collect it; (b) foreclose upon its lien and liquidate any Collateral securing this Agreement according to law, including by using self-help repossession; (c) exercise all other rights, powers and remedies given by law; and (d) recover from BORROWER all charges, costs and expenses, including all collection costs and reasonable attorney's fees incurred or paid by the LENDER in exercising any right, power or remedy provided by this Agreement or by law.

(Id. at 17, 21, 26, 31, 37.)  To date, DTL has not enforced its right to repossess Plaintiff's Vehicle or taken any other action permitted in this paragraph covering "Lender's Rights in the Event of Default."  (Id. at 6.)

**B.    Arbitration Provision**

The Loan Agreements also have an "Arbitration Provision" which "describes when and how a Claim . . . may be arbitrated."  (Id. at 17, 21, 26, 31, 37.)  A subsection of the Arbitration Provision is entitled "Governing Law" and provides:

> This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. §§ et seq. [sic] (the "FAA") and not by any state arbitration law.  The arbitrator must apply applicable substantive law consistent with the FAA and applicable statutes of limitations and claims of privilege recognized by law.  The arbitrator is authorized to award all remedies permitted by the substantive law that would apply if the action were pending in court.  At the time of request of either party, the arbitrator must provide a brief written explanation of the basis of the award.

(Id. at 18, 22, 27, 32, 38.)  The Arbitration Provision explains how arbitration is initiated:

> <u>*How Arbitration Is Started:*</u>  Either you [the borrower] or we [DTL] may require any Claim to be arbitrated.  Arbitration is started by giving written notice to the other party of the intent to start or to compel arbitration.  This notice may be given before or after a lawsuit has been started over the Claim or with respect to other Claim [sic] brought later in the lawsuit.

4

(Id. at 17, 21, 26, 31, 37.)

Under the loan agreements, the term "Claim" "means any claim, dispute, or controversy between you [the borrower] and us [DTL] that in any way arises from or relates to this Agreement or the Vehicle (excluding either party's right to file and maintain a claim in an appropriate small claims court) securing this Agreement." (Id. at 17, 21, 26, 31, 37.) The term "Claim" excludes:

> (i) [DTL's] right to enforce our security interest and to obtain possession of the Collateral by seeking replevin judgment or by using self-help, provided such an action seeks only possession of the Collateral and not a personal monetary judgment against you, or (ii) any individual action in court by one party that is limited to preventing the other party from using a self-help remedy and that does not involve a request for damages or monetary relief of any kind.

(Id. at 17, 21, 26, 31, 37.) A borrower may opt out of the Arbitration Provision pursuant to the following language:

> ***Your Right to Reject:*** **If you don't want this Arbitration Provision to apply, you [the borrower] may reject it by mailing us [DTL] a written rejection notice . . . . A rejection notice is only effective if it is signed by all Borrowers and cosigners and if we receive it within fifteen (15) days after the date of this Agreement. If you reject this Arbitration Provision, that will not affect any other provision of this Agreement or the status of your Agreement. If you don't reject this Arbitration Provision, it will be effective as of the date of this Agreement.**

(Id. at 17, 21, 26, 31, 37 (emphasis in original).) Plaintiff did not mail DTL a written rejection of the Arbitration Provision.

### C.  History of Litigation

As stated above, at the end of 2011, Plaintiff defaulted on his fifth loan. (Id. at 6.) On July 26, 2012, Plaintiff's attorney faxed a letter to DTL's attorney stating: "Mr. Nixon disputes Delaware Title Loans' lien on the title to his automobile. Mr. Nixon's loan is paid off, and his title should be returned to him." (Doc. No. 6-2 at 1.) The letter cited the language in paragraph 13(c) of the Arbitration Provision ("[e]ither you or we may require any Claim to be arbitrated.

5

Arbitration is started by giving written notice to the other party of the intent to . . . compel arbitration"). (Id.)  The letter also stated: "***This letter is Mr. Nixon's notice to compel Delaware Title Loans to arbitrate its right to maintain a lien on the title to his car***.  Mr. Nixon chooses the AAA [(American Arbitration Association)] as his arbitration administrator and desires the arbitration hearing to be held in his home town of Philadelphia, Pennsylvania." (Id. (emphasis in original).)  DTL did not respond to this letter.  (Doc. No. 6 at 5.)

On August 27, 2012, Plaintiff's attorney faxed a second letter to DTL's attorney.  (Doc. No. 6-2 at 4.)  Plaintiff's second letter essentially made the same demands as the July 26, 2012 letter, including a notice to compel arbitration.  (Id.)  DTL did not respond to this letter.  (Doc. No. 6 at 6.)  On November 12, 2012, Plaintiff's attorney faxed a third letter to DTL's attorney.  (Doc. No. 6-2 at 7.)  The third letter also included a notice to compel arbitration, and raised for the first time a dispute with the interest rate charged on the loan.  (Id.)  DTL did not respond to this letter either.  (Doc. No. 6 at 6.)

On December 14, 2012, Plaintiff filed the Complaint with this Court against DTL, CLA, and Reich.  (Doc. No. 1.)  In the Complaint, Plaintiff alleges a RICO violation under 18 U.S.C. § 1962(c) for collection of unlawful debt, and usury in violation of 41 Pa. Cons. Stat. §§ 201, 408, 501–04.

On March 1, 2013, Defendants filed the Motion to Compel Arbitration and Stay Proceedings (Doc. No. 3-2), citing the Arbitration Provision in the Loan Agreement.  Defendants argue that the Court must stay proceedings pending the outcome of arbitration.  (Doc. No. 3-2 at 4–13.)  On March 18, 2013, Plaintiff filed a Response in Opposition to the Motion (Doc. No. 6), arguing that the Arbitration Provision is void.  Plaintiff contends that because DTL failed to initiate arbitration after receiving his letters disputing DTL's right to collect on the defaulted loan

or maintain a lien on his vehicle, DTL breached the Arbitration Provision, rendering it unenforceable. (Id. at 9.)

On March 25, 2013, Defendants filed a Reply to Plaintiff's Response (Doc. No. 9). On April 3, 2013, with leave of Court, Plaintiff filed a Sur-Reply Brief (Doc. No. 12). On April 3, 2013, the Court held a hearing on the Motion. On April 9, 2013, Supplemental Memoranda were filed by the parties (Doc. Nos. 14, 15). The matter is now ripe for the Court to determine whether the motion to Compel Arbitration and Stay Proceedings should be granted. In deciding this Motion, the Court has considered the items filed of record and the arguments of counsel at the April 3, 2013 hearing.

### III.   STANDARD OF REVIEW

Under the Federal Arbitration Act:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The issue before a district court on a motion to compel arbitration is whether a valid arbitration agreement exists. Great W. Mortgage Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997).

When analyzing whether parties have entered into a valid arbitration agreement, a district court must determine: (1) "whether there was an agreement to arbitrate;" and (2) "whether the agreement is valid." Gay v. CreditInform, 511 F.3d 369, 386 (3d Cir. 2007) (quoting Great W. Mortgage Corp., 110 F.3d at 228). In conducting this inquiry, the court does not consider the merits of the claims at issue. Id. The standard of review on a motion to compel arbitration is the

7

same as the standard of review on a motion for summary judgment.  Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 n.9 (3d Cir. 1980).  "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement."  Id. at 54.

A written arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The effect of [9 U.S.C. § 2] is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983).

Federal courts strongly favor arbitration, and the text of the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution."  Marmet Health Care Ctr., Inc. v. Brown, 132 S. Ct. 1201, 1203 (2012) (quoting KPMG LLP v. Cocchi, 132 S. Ct. 23, 25 (2011) (per curiam)).  "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  Moses H. Cone Mem'l Hosp., 460 U.S. at 24–25.

IV.   ANALYSIS

    A.   **Defendant Was Under No Obligation To Initiate Arbitration As A Remedy For Plaintiff's Default On A Loan**

Plaintiff contends that DTL's right to collect on his defaulted loan through self-help repossession or otherwise (DTL's "collection claim") is the original "claim" at issue in this litigation.  (Doc. No. 6 at 4–6.)  He characterizes his RICO and usury claims alleged in the Complaint as "counterclaims" to DTL's "collection claim."  (Id. at 6.)  Plaintiff is mistaken, however, in this characterization.  Plaintiff's RICO and usury claims are not counterclaims —

they are the original claims upon which Plaintiff has chosen to sue DTL in this Court, and which DTL now seeks to arbitrate.

As stated above, the provision in the Loan Agreement defining "LENDER's Rights in the Event of Default" provides as follows:

> LENDER <u>may, at its option</u>, and without notice or demand, do any one or more of the following: (a) declare the whole outstanding balance due under this Agreement due and payable at once and proceed to collect it; (b) foreclose upon its lien and liquidate any Collateral securing this Agreement according to law, including by using self-help repossession; (c) exercise all other rights, powers and remedies given by law; and (d) recover from BORROWER all charges, costs and expenses, including all collection costs and reasonable attorney's fees incurred or paid by the LENDER in exercising any right, power or remedy provided by this Agreement or by law.

(Doc. No. 1 at 37 (emphasis added).)  Plaintiff defaulted on the fifth loan at the end of 2011, triggering DTL's right to take action under the default provision.  (<u>Id.</u> at 6.)  Because the provision includes the language that DTL "may, at its option . . . do any one or more of the following . . . " DTL was not required to exercise any of its rights under this provision, and Plaintiff cannot force DTL to invoke its rights or initiate an arbitration proceeding to enforce its rights.  Though DTL had the right to repossess Plaintiff's car or pursue any other right listed, it was under no obligation to do so.  Simply put, under the circumstances here, the right to initiate an arbitration proceeding as a means to collect the debt owed by Plaintiff is a path that DTL could have chosen, but was not required to pursue.

Moreover, DTL's right to maintain a lien on Plaintiff's car is not a "Claim" under the express terms of the Loan Agreement, and DTL cannot be forced in the first instance to arbitrate the legitimacy of the lien.  (<u>Id.</u> at 37.)  In a case involving Plaintiff's counsel and DTL regarding the same contract provisions in dispute here, the Third Circuit found that "[t]he contract's arbitration clause requires both parties to arbitrate any disputes, but there is a significant exception to the parties' requirement to arbitrate.  DTL, the lender, is not required to enter

9

arbitration before seeking repossession of the vehicle through judicial process or self-help." Kaneff v. Del. Title Loans, Inc., 587 F.3d 616, 619 (3d Cir. 2009).

Here, DTL's right to maintain a lien on the car was challenged by Plaintiff in the three letters sent to DTL. Although the provision of the Loan Agreement on "How Arbitration is Started" permits a "Claim" to be arbitrated, specifically excluded from the term "Claim" is DTL's "right to enforce [its] security interest and to obtain possession of the Collateral by seeking a replevin judgment or by using self help . . . ." (Doc. No. 1 at 37.) Consequently, arbitration cannot be compelled over a dispute on the validity of the lien.

Finally, even if Plaintiff had the right to initiate arbitration on the collection claim, his three letters to DTL were not sufficient to require arbitration. The July 26, 2012 letter to DTL states: "***This letter is Mr. Nixon's notice to compel Delaware Title Loans to arbitrate its right to maintain a lien on the title to his car***. Mr. Nixon chooses the AAA as his arbitration administrator and desires the arbitration hearing to be held in his home town of Philadelphia, Pennsylvania." (Doc. No. 6-2 at 1 (emphasis in original).) Although the Arbitration Agreement provides that "[a]rbitration is started by giving written notice to the other party of the intent to start or to compel arbitration" (Doc. No. 1 at 17, 21, 26, 31, 37), Plaintiff's letters were not sufficient to initiate arbitration. As noted above, DTL could not be forced to begin an arbitration proceding over the lien, and merely giving notice of an intent to compel arbitration in writing to an opposing party does not initiate an arbitration proceeding. Plaintiff may initiate the proceeding himself and pay a filing fee with the arbitrator.[4] DTL can then present any defenses

---

[4] The Arbitration Provision provides that "[a]rbitration of a Claim must comply with . . . the applicable rules of the arbitration Administrator." (Doc. No. 1 at 37.) Under the AAA's rules governing consumer arbitration:

it has before the arbitrator. But the three letters sent to DTL did not commence an arbitration proceeding.

### B. <u>Brown v. Dillard's, Inc.</u> Does Not Support Plaintiff's Position

Plaintiff argues that DTL has breached the arbitration agreement by not filing for arbitration after receiving the three letters, and relies on <u>Brown v. Dillard's, Inc.</u>, 430 F.3d 1004 (9th Cir. 2005), in support of this position. In <u>Brown</u>, Dillard's fired Brown, who thereafter alleged that the termination was wrongful. <u>Id.</u> at 1008. Brown then filed a notice of intent to arbitrate with the AAA, including a short description of the nature of the dispute, and paid her share of the arbitration fee. <u>Id.</u> The AAA sent notices to Dillard's requesting that it pay the filing fee and participate in the arbitration, but Dillard's ignored the communications from the AAA. <u>Id.</u> at 1008–09. Brown tried repeatedly to discuss the arbitration with Dillard's. <u>Id.</u> at 1009. Later, on a conference call with a representative in Dillard's legal department, the representative told Brown that Dillard's refused to participate in the arbitration because her claims were meritless. <u>Id.</u>

Unsuccessful in her repeated attempts to participate in arbitration, Brown filed a lawsuit in Los Angeles County Superior Court against Dillard's alleging twelve causes of action. <u>Id.</u> Dillard's removed the case to federal court and then moved to compel arbitration. <u>Id.</u> The district court denied Dillard's motion. <u>Id.</u>

---

> The filing party (the "claimant") must notify the other party (the "respondent"), in writing, that it wishes to arbitrate a dispute. This notification is referred to as the "demand" for arbitration. . . . The claimant must also send two copies of the demand to the AAA at the time it sends the demand to the respondent. . . . The claimant must also send the appropriate administrative fees and deposits.

(Doc. No. 9 at 8.)

On appeal, the Ninth Circuit affirmed the district court's ruling and held that Dillard's had breached the arbitration agreement, rendering it unenforceable. Id. at 1010. The court reasoned that "when an employer enters into an arbitration agreement with its employees, it must itself participate in properly initiated arbitration proceedings or forego its right to compel arbitration." Id. at 1006.

Brown is distinguishable from this case. First, Brown's alleged unlawful termination was a claim that belonged to her, not Dillard's. Here, the "collection claim" Plaintiff attempted to arbitrate belongs to DTL, not Plaintiff, and the legitimacy of DTL's lien on Plaintiff's vehicle cannot be compelled to arbitration under the express terms of the contract. Second, Brown initiated an arbitration by filing a notice of intent to arbitrate with the AAA and describing her dispute with Dillard's. She also paid her share of the arbitration filing fee. Here, Plaintiff did not file a notice of intent to arbitrate with AAA and did not pay an arbitration filing fee. He merely sent three letters to DTL stating that he intended to arbitrate the "collection claim." This was insufficient to initiate an arbitration. Thus, Brown is inapposite to the facts at issue here.

## V.     CONCLUSION

Defendants' Motion to Compel Arbitration and Stay Proceedings will be granted as unopposed as to Defendants CLA and Robert Reich. It will also be granted as to Defendant DTL in accordance with the Opinion above.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNELL L. NIXON,

    Plaintiff,

v.

DELAWARE TITLE LOANS, INC., et al.,

    Defendants.

CIVIL ACTION
NO. 12-7005

### ORDER

**AND NOW**, this 23rd day of May 2013, upon consideration of Defendants' Motion to Compel Arbitration and Stay Proceedings (Doc. No. 3), Plaintiff's Response in Opposition (Doc. No. 6), Defendants' Reply in Further Support of the Motion (Doc. No. 9), Plaintiff's Sur Reply in Opposition (Doc. No. 12), the arguments of counsel at the hearing held on April 3, 2012, Defendants' Supplemental Memorandum in Support of the Motion (Doc. No. 14), Plaintiff's Supplemental Memorandum in Opposition (Doc. No. 15), and in accordance with the Opinion of the Court issued this day, it is **ORDERED** as follows:

1. Defendants' Motion to Compel Arbitration (Doc. No. 3) is **GRANTED**.
2. The parties shall proceed to arbitration in accordance with the terms of the written Arbitration Agreement.
3. The Clerk of Court shall **STAY** this case pending completion of arbitration.
4. The Clerk of Court shall place this case in **SUSPENSE**.
5. Counsel for the parties shall notify the Court in writing about the status of this matter every thirty (30) days.

BY THE COURT:

/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.